Will the clerk please call the next case? 116-1027 Millenium Knickerbocker Hotel v. Woody Guzman Good morning, everyone. Nadine Neuer for Millenium Knickerbocker Hotel, for the law firm Lewis & Benedetto. And we'll go right into the first part of our brief, which is jurisdiction. I've read a bunch of the jurisdictional cases this morning, and we could be here all morning and all afternoon. Let's talk about Flynn and Loyola University of Chicago, and tell us why those cases aren't controlling. Well, basically what I found specifically when I reread them this morning is that the courts tried to clarify that the commission should be able to administer and administrate themselves. So it's a difference between enforcing an unambiguous contract versus interpreting a contract. And that's part of the issues we have here because the commission... Wait, let me just... Yes. You've read Flynn, you've read Loyola University, you've said several times... Yes. Flynn held specifically that the commission is authorized to assess penalties and attorney's fees under the Act against the party who fails to comply with the terms of the settlement agreement. We then determined that in conjunction with the commission's assessment of penalties and fees, the commission has jurisdiction to construe the terms of the settlement agreement. That was also affirmed in the Loyola case. If they're going to deal with the issues of penalties, they must, of necessity, construe the terms of the settlement agreement. So isn't that exactly what the motion here was about? Actually, I have my notes on the side of the case, if I could find them, because I went over it this morning again. What I was trying to say is that from what I found, and we can disagree on this, is that there is the circuit court who is to interpret contracts and contract construction... Well, that may be true, but you keep ignoring the holdings in those cases. That's true as a general matter. Loyola and Flynn clearly say that to be able to assess the penalties, the commission has the jurisdiction to interpret the terms of the settlement agreement entered into between the parties. Talk about those holdings and don't tell us about the general rules of what a circuit court can do. Tell us why those holdings do not apply here, and then you can move on to your next point. All right. Maybe you want to tell us that Flynn and Loyola were wrongly decided, because they're absolutely contrary to 19G. That would be... And maybe we ought to rethink about what they say, because 19G not only provides that it's the circuit court that will enforce final decisions of the commission, but it also says that it's the circuit court that will administer penalties and fees in the event that they find that there's been a vexation. So Flynn and Loyola seem to be decisions that were decided contrary to 19G. Maybe we ought to rethink those decisions. Possibly. And I think what I did to myself is that I tried to overcompensate for the obviousness that, yes, I don't think they were decided correctly. I think 19G is the obvious... Well, I understand you're in a tough position telling a group of judges that what they decided before doesn't make any sense. Try not to go there. But, like, this clarifies what I said at the beginning. We could be here all morning and all afternoon. It's not an easy concept. It's a very all-encompassing, there's lots of case law. And there is the point where I was trying to differentiate this morning between the commission having to administrate themselves versus having some form of oversight with the circuit court, because the circuit court is supposed to be the interpreter of contract language and contract law. Do you see the difference? Maybe I went too far there. But I would like to get to the actual case at hand, because I think the story is incredibly interesting, and there's a lot more issues going on in here. The commission specifically said that they felt the contract was unambiguous because of an X on the front and did not actually include any of the language on the back of those contracts, which had a lot of disputed language. What year did the employer sign the contract? That's what I was getting to next, the story in itself. So January of 2007, before the contracts were even signed in July of 2007, petitioner went back to full-day work. Okay? Then in July of 2007, the employer signed contracts and sent them out with disputed language on the back but that X on the recitals in the front. Those contracts were rejected. Nothing was heard about those contracts. Suddenly in 2011, those contracts were received by a respondent. Not anything new, nothing regarding negotiations that were had, but mysteriously. So imagine sitting in your office and you get these mysterious contracts from 2007, which are for less than what had been discussed, and you're thinking, maybe I should call my opponent and find out if they're feeling okay. But I'm not their attorney. And this language, at least on the back, in the terms, in the meat, in the industry, that is the meat of the contracts, has very clear disputed language. So what reasonable rational person is going to say, oh, well, we clearly have to avoid all of this because of the X? I mean, I've drafted numerous contracts with a writer that's 10 pages long, and I can tell you I don't remember whether I Xed the front or not. Counsel, at the time the employer signed the contract, was the information on the first page of the contract that the employer had paid all medical bills accurate? Actually, I don't believe it was. How could it be? I'm knowing. How could it be? Check the box that said they were. All the language that we dispute. They were paid and they were not. Yes. But it gets worse than that, right? Because isn't there a follow-up line that says list all unpaid medical bills in the space below and nothing was listed? So the question I have is how could any person looking at this reasonably interpret it as believing there were outstanding bills that had not been paid? How would anybody come to that conclusion? Well, that's an excellent question. You know, I keep saying the back of the contracts are in the industry what everyone looks at all the time, and that language is extensive. What does it have to do with checking the boxes that say there's no medical bills outstanding? I think I'm misunderstanding your question. My question is, as the commission found, the face of the contract indicates all medical bills were paid. There's a section that says list all unpaid bills in the space below. That was left empty by the drafter, your side of the contract. So how do you possibly interpret that as indicating there were some outstanding disputed bills? That's the question that needs to be answered. Here's the answer to that question. In July 2007, the bill was still being rendered. In January 2007, petition went back to work. There was no discussion about ongoing treatment. Contracts were drafted for a disputed, like, to resolve all the issues because the IME had said they, the treatment needed to rise. Well, by the way, who drafted the contracts? Yes. The Respondent or the Claimant's Attorney? I'm sorry? Who drafted the contracts? The Respondent's Attorney. So you had control of the contract language, right? And that is the recital on the front, but also realize the person who drafted those contracts was in July of 2007. The medical bill hadn't even been completed yet. There's absolutely no way that $16,000 of the bill that was then presented in 2007 was even rendered or even available at that time. So we're back to 11. When the contract came in, obviously you as a diligent attorney reviewed it. You saw that the language was still the same. It said all bills were paid, no bills were outstanding, correct? The disputed language on the back also said. Right, but you saw the language on the front. I wasn't there at the time. Let's look at this from the standpoint of the interpretation of a contract. Because the settlement contract we review as we would any other contract, right? So the Commission reviewed the contract and looked at that, what is essentially a recital, that all bills have been paid and interpreted that as an obligation on the part of the employer to pay all bills. Is that right? All bills that they said were known, but they couldn't have been known at the time that the contracts were drafted. But just so that we understand this, what appears at page one of the contract is a recital that says employer has paid all, or all medical has been paid. That's what it says. You have two choices, has paid, has not paid. And the Commission then interprets that as contractual language, a contractual obligation that the employer is assuming that it pay all medical bills. Is that right? Well, actually, apparently when you X that, you also include any known or unknown, because like I said, the bill was not even finished or rendered by the time that those contracts from 2007 were drafted. Well, I'm just having, I'm not sure I follow that, but I'm just having a little trouble, purely from a contract standpoint, turning what appears to be a factual recital, something has occurred, into an affirmative obligation on the part of one of the parties to actually do something. To say all bills have been paid and then turn it into a contractual obligation that this party has now agreed to pay all medical bills, to me is a stretch. Can you speak to that? Yes, I definitely agree with you. I think that's one of the reasons that you have the terms on the back, which I said before, the meat of the contracts. In the industry, that's what everyone slaves over, those terms of the contracts. Now, do you realize what this would do, what havoc this would wreak if we agreed with your position? Nobody could ever agree, rely on the face of a contract. What you're saying is, hey, it says all bills are paid, no bills are outstanding, Mr. Clayman, but we can get something later. If something comes in later, we've got this general obfuscation in the back that allows us to deny the medical payments that exceed your recovery. And you think that's a good statement for this Court to make? Currently, what we have at the commission, what we're having happen is that petitioner's attorneys insist that we have to X the yes for everything, even if there are disputes. But apparently if there are disputes on medical bills, we can't do anything about that. If we X it, we're taking the whole thing into consideration because the back of the contracts are not being considered. At least that seems to be what's going on in this case. The Hagen case specifically was decided differently, and you can take a look. Specifically, one of the things I want to point out is that the respondent said that they had no issues and no disputes with those medical bills. And the Court really specifically looked at that and said, you know what, you guys are arguing about additional medical bills that came up after the contracts were signed and completed, but you say you don't have a dispute with them. The language on the back of the contracts, which I'll say again is the meat of what every young man in the industry looks at, had very detailed disputed language. The bills and the treatment wasn't even done until August of 2007. These contracts were drafted in July 2007. Then they were presented in 2011. Well, that's all well and good, but you had a chance to check on it in 2011, didn't you? Actually, they were received after they'd already been approved. And then the question is, what do we do now? Do we redo the whole thing over again? Because the language on the back literally states everything was disputed. No, you sent it back and let the claimant think that all the bills were paid. How could they have thought that? Because the contract said they were paid. No, the back of the language is very disputed. All right, we'll go back to the back of the contract. Okay. We could go on and on about this all morning. We need to move on to the next thing. They never actually presented any bills until 2014. The commission will move on to penalties. Do you believe penalties are appropriate in this case? Are you asking us a question? Yes, I am. Do you want your advisory opinion? I don't think they should be. I think we ask the questions and you get our answers and what are called opinions. You actually have four minutes left in your audience. Sure. I don't believe penalties are appropriate. Okay? Why is that? First of all, the bill wasn't even rendered. Okay? The bill was never supplied. They had a motion to enforce that they presented three to four years later. By the time they actually were going to present their motion to enforce, they didn't even have the medical records that they needed to present their motion to enforce. The arbitrator or the commissioner didn't even render a decision until a year later. It was just lost. They couldn't find the decision. But, frankly, if they don't even have the information they need to present their materials and they have to continue their arguments, how can you say it's vexatious and unreasonable for us not to have paid the bills if the evidence wasn't presented? We didn't actually get a copy of the bill until 2014 when a motion to enforce was presented. As far as we understood, contracts had been presented from 2007 and the case was closed. The amount was provided for the contracts from 2007, $7,800 was provided, and there was no request and no statement about anything else until 2014. Did they wait so that they could get penalties? I certainly hope not. So your position is they didn't present the proper documentation to warrant penalties? They should present the proper documentation, and if they wanted those bills, if those bills were around in 2011, why didn't they ask about it then? Why wait for three years? Actually, I'm not disputing with the logic of that argument. Thank you. And I'll leave it at that. Thank you, counsel. You have time in reply. Counsel, you may respond. Good morning. Sorry. Good morning, everyone. My name is Dominic Marcharolo. I represent the petitioner on the penalty here, Rudy Guzman. Based interpretation of this claim, it's a contract issue. Counsel, before we get to that, let's talk about this jurisdictional issue. I find a couple of cases that don't agree with Flynn-Orloyola. There's a case called APER versus National Union Electric that says the purpose of 19-G is to provide a recipient of compensation a method to enforce its award because the industrial commission has no power to do so. I believe in that decision, 19-G does sort of conflict with the penalty of Flynn-Orloyola. In this case, even if jurisdiction is not followed at the commission level, the circuit court also agreed that penalties should be enforced. Well, yeah, but the point is the circuit court is the one that has to make the underlying decision as to whether the contract has or has not been breached. So in this particular case, you can't bootstrap a decision of the circuit court, which was merely reviewing a commission's decision using the standard rules of review and say that the circuit court decided a 19-G case. Circuit court didn't decide a 19-G case, and I have real difficulty trying to figure out where a commission gets the authority to enforce a commission decision more than 20 days after it's been final. I believe that decision does lie within Flynn. I understand the dispute. Well, I understand what Flynn says. I think Flynn is wrong, and I think Loyola is wrong for relying on it because 19-G should be very, very clear. The enforcement lies with the circuit court, and the circuit court can award penalties and fees. So both of them get to do it? Either one gets to do it? Well, yes. Under the section of the Act, under 19-K, 19-L, the Loyola Workers' Compensation Act also has the power to inflict penalties when they find that there's been a facetious delay. But that would mean that the commission maintains jurisdiction to infinity. I disagree with that form. I believe that here in this particular case, this is different. The enforcement of the settlement contracts is a secondary claim. It's not just these are the contracts. And I think you hit on the magic concern here. The power of the jurisdiction to interpret the settlement agreement is because of the authority to determine penalties and fees. If there was simply a motion to enforce, would it be the same unless there was a claim for penalties and fees? The argument would be stronger if there was no claim for penalties and fees, correct? I disagree with that. I think that the motion for penalties and fees goes along with the motion to enforce. Because only with the motion to enforce. That's what I just said. Hold on, hold on, hold on. Flynn does not say that the Workers' Compensation Commission has the right to enforce the agreement. It only says it has the right to interpret it. So if you interpret an agreement but you cannot enforce it, then it would appear that under Flynn, the only thing that Flynn would allow you to do is award fees. You could never award benefits of any kind, even if you interpret the contract to suggest that the claimant was entitled to it, which, by the way, makes no sense at all. But that's what Flynn says. And then we have cases that suggest, the Roadhouse case suggests, that the commission has the authority to assess penalties after a final decision, but no authority, no authority to award any benefits. So if 19G says the only way you get to enforce a final decision of the commission is with the circuit court, and the circuit court has the power to award penalties and it has power to award fees, what in heaven's name does Flynn mean? That they get to do it too? I believe it does. I believe it does. And I believe it makes no sense. So you're saying they have co-jurisdiction. Well, on the certain facts of the case, given here that when you have a decision or a settlement contract, they're equal. An award by the arbitrator of penalties and fees for somebody not paying temporary total disability benefits and not paying medical bills can be awarded by the arbitrator. However, here, if they can't award penalties, then why have them interpret the contract? They can say, yes, we brought it up to the circuit court. Well, that's a good question. That's a good question. Why don't you just file a 19G, go to the circuit court, say, here, interpret this contract. I'm entitled to have my medical bills paid. They didn't pay them. And I'm entitled to penalties and fees. And that's exactly what 19G says you can do. But our first recourse is to, in the interpretation of the Illinois Workers' Compensation Act, our first recourse is with the Industrial Commission. Where does it say that? Where does it say anywhere in the Industrial Commission, in the Workers' Compensation Act, that the Workers' Compensation Commission gets to enforce a contract more than 20 days after it's filed? Where does it say that? Informed. I didn't ask you what Flynn says, because I think Flynn makes no sense. I'm asking you where it says that in the act. I don't think it says it in particular. And it doesn't say it at all in the act, does it? It does construe that the Industrial Commission can award penalties, can award attorneys' fees, for a fixation delay of payment of bills, a fixation delay of payment of medical bills. Now, in the event we were to find that there was no jurisdiction to hear this case in the first instance and we vacated it, you still have a right to go back to the circuit court on the 19G, don't you? Correct. Well, what arguments would you make wherever you end up? One more time, Mr. Chairman? Well, let's move on. What's your other issue? Oh, sorry. Okay. Going back, we think it's a construction issue, a contract issue, and the construction of the contract. The four corners of the contract control, here in this case, it's not just what's on the contract, meaning the X where all the medical bills are paid, it's what's not there. In the listing, the listing of unpaid medical bills, there's nothing listed. And contract law states the interpreter, the drafter of the contract, has the allegation. It's construed, any ambiguity is construed against the drafter. In this case, the drafter is the plaintiff here appellant. However, they drafted a contract saying that all medical bills were paid and listed no medical bills are unpaid. Counsel, let me ask you this. Were there medical bills that postdated the employer's signing of the contract? Yes. So what in the contract obligated the employer to pay a future medical? When you say future medical, the medical bill gets dropped about a month after the contracts have been approved. Are you saying medical services predated the employer's signing of the contract? Yes, and not only medical services predate the signing of the contracts by the respondent, the respondent's own independent or the appellant here or an independent medical exam doctor reviewed those medical records and come to his own conclusion about the status of the petitioner. Okay, just so that we're clear, there were no medical services that you sought payment for that postdated the employer's signing of the contract? No, there were postdated signing of the contract, not approval of the contract. I just want to know when the medical services occurred in relation to when the employer signed the contract. Were there medical services performed after the employer signed the contract? Yes, Your Honor. Okay, what in the contract then obligated the employer to pay for those future medical services? Two parts to that. The respondent at that point would have known that the medical would be incurred because those medical bills were outstanding, and they would use medical records from that doctor specifically in the use of their independent medical exam. You're seeking to enforce the terms of a contract, though, so we've got to look at the contract language. What in that contract obligated the employer to pay for future medical? That's all. And, you know, we may be talking about what's typically done before the commission, so forth, but really we're evaluating a contract and we're interpreting a contract. So what in that contract serves as the employer's agreement to be obligated to future medical? Let me kind of go through the contract just a little bit, Your Honor. In this case, the contracts were drafted in 2007 by the respondent's firm. However, the client did not accept the contracts at first. When they first were submitted to him for his signature and for accepting the contract. Some time had passed. The client had been lost for a while and came back around. Respondent actually filed a motion to dismiss the case or have the contracts approved. None of this is relevant in the interpretation of a contract unless the contract is ambiguous. What is the clear-cut contractual language that obligated the employer to pay these medical bills for services occurring in the future? That's all. I want to know what language in the contract obligated the employer to do that. If there is, let me know. If there isn't, let me know that. I don't think there's any specific language obligating them to pay for any medical bills post their signature of the contracts. However, their agreement to pay medical bills. In workman's compensation, when the contract is agreed to, or not agreed to, but when the mark of the excess by medical bills be paid, then those medical bills that they're agreeing to, those medical bills should be paid. Some medical bills don't come in until after the contracts are approved. That is a problem sometimes. But some billers don't get the medical bills in or the respondents don't receive them. Or the client goes to a facility where he sees a doctor here. They have a medical bill. He does diagnostic testing, goes to a different facility. Those medical bills come in later. What you're saying is this is how things happen. This is the practice before the commission. Not necessarily what we can discern looking strictly at the contract, but you're saying this is how we view this contract. This is how we all interpret this contract. This is how it happens. I think we use both. The four corners of the contract do rule. However, the interpretation is if medical bills are agreed to be paid, then they're being paid, whether or not they've received notice of those medical bills prior to the signing of the contract. Moving on to the penalties. In such a case like this, this is exactly what we talked about earlier. When a medical bill is unpaid and it's agreed to be paid, this is exactly the case when a commission has power to impose penalties. These medical bills were incurred in 2007. Respondent made a motion to dismiss the claim and have the contracts approved in 2011. We spoke to the client. He agreed to the terms of the contract, relying on the fact that those medical bills would be paid. He gave up his right to future medical. He gave up his right to a trial for arbitrator. He gave up his right to an appeal by accepting the terms of that contract. Our client accepted the terms of the contract and expected the medical bills to be paid. Lo and behold, a couple of years passed, the medical bills are still unpaid. We make a motion to enforce the signing of the contracts on their face, and we go through this process. And in that time period, even since then, the medical bills are still unpaid, even after the commission decision, the circuit court decision, and now we're here. It's probably almost ten years since the incurment of those medical bills, and they're still unpaid. The petitioner, or the appellee here, Mr. Guzman, has been dealing with prayers calling for these medical bills, a doctor's got a bill outstanding for 11 years, all because we could not get this issue resolved somewhere earlier. That's what we're here to do today, to get this issue resolved. What was your explanation for why those contracts sat somewhere for years without being executed? The petitioner had not accepted the terms of the contracts until the respondent made a motion to either accept it or not, and then Well, why was it just sat in for you until the respondent made a motion? Why? I can attest to it. Can you fill in the gaps? To why the respondent waited that period of time, I don't know. Okay. And we basically asked that the arbitration decision from the Illinois Welfare Compensation Commission and the circuit court to award penalties be adopted and affirmed. Okay, thank you, counsel. Well, I guess the appellant's counsel has left. No. Oh, I'm sorry. How long did you go to law school? How long did you go to law school? Yeah, that's a privilege you get when you're admitted to the bar that we all work very hard for. And I think maybe you'd better take advantage of that and stay at counsel's table. You won't have to be making notes on your knees. That's why we have a table. Now, do you want to reply? Okay. Specifically regarding the statement of the X and the signature of the contracts versus the knowledge of the respondent of what was actually paid, not paid, the independent medical examination was completed February 2007. Even prior to that, the petitioner had returned to work full duty. Okay? Then in July of 2007, the contracts were drafted. There was no knowledge of the ongoing treatment. That treatment was not completed until August 2007. So if we were going to decide regarding the intent of the drafter in 2007, there were medical bills prior to January of 2007 and February of 2007 prior to the IME that were being disputed, which you could then say, well, that is what was known. Okay? After the January and February IME, January returned to work and the February IME, there was no knowledge of the additional medical bills. Okay? That's the one point that I wanted to make. The other point I wanted to make is these contracts from 2007 did disappear. They were thought to have been rejected. There were ongoing negotiations. Specifically, counsel said he was negotiating the bill. He was trying to negotiate the bill. What exact bill that was, as far as we were concerned, that was January and February 2007, which is what the IME had reviewed. Okay? And then we get the contracts from 2007 with the disputed language on the back. So basically, if we want to discuss the X on the contracts and what that means and what the intent of the parties were, you know, there were subsequent negotiations, and counsel kept saying that they were negotiating the bills. So when he says that he sat up with his client and these 2007 contracts were supposed to be paid stuff and bills that were incurred after even the drafting of those contracts, that's not believable. However, point of clarification, you were not obligated to sign anything in 2011 without first checking to see what bills were outstanding. You could have done that, right? We actually never saw those contracts again. Those contracts were presented to us after they were approved. And then the choice we had was to revoke those contracts. You know, the question really was why would counsel, on the other side, having gone over all the language, including the language on the back with his client, having worked on negotiating the bills, send us contracts that they'd rejected back in 2007 when there had been ongoing negotiations? The intent of the drafter on the response side was from 2007. The intent on the signatures and petitioners' side were in 2011. Well, to protect yourself, wouldn't it have been wise to check and see if there were any outstanding bills? I guess it would have been. What about the bills with $200,000? You just assume, well, everything's okay, you know. We're going to sign this and send it back. You were the drafter over it. You had control of it. You could object. And the back of the contracts had very detailed language about objections. Well, you took a leap of faith, and obviously there was a problem. And the other thing you have to understand, that if the front of the contracts, like we were discussing before, has the intent of the parties of when that act was made regarding medical bills were paid, the knowledge of the respondent was that they were up to January and February 2007. But even you started out the entire argument saying this case is an unusual procedural dispute. It is. If something comes in years later, there's no reason you couldn't have checked and looked into these issues. The problem is if a contract comes in approved, and there's already the language of the dispute, going over everything again, it's been disputed and it clearly says that that's what should have been. But that's why hard cases make difficult law. And this case, an ounce of prevention, might have been worth a pound of cure. I'll leave you with that thought. I will not disagree with you there. Thank you, Counsel. Both this matter will be taken under advisement. A written disposition shall issue.